IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:10-CV-00182-RLV-DSC

| | |
|---|---|
| CHASTITY DAVIDSON, in her individual capacity and as Administratix of the Estate of ANTHONY DEWAYNE DAVIDSON, )<br>)<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CITY OF STATESVILLE; )<br>OFFICER DAVID WAYNE LOWERY, )<br>in his individual and official capacity; )<br>OFFICER WILLIAM HOWARD )<br>GOFORTH, in his individual and official )<br>capacity; IREDELL COUNTY )<br>SHERIFF PHILLIP H. REDMOND, )<br>in his individual and official capacity; )<br>OHIO CASUALTY INSURANCE CO.; )<br>OFFICER JASON PATRICK CLOER, )<br>in his individual and official capacity; )<br>CORPORAL CHANCE ALLEN )<br>WILLIAMS, in his individual and )<br>official capacity; and OFFICER MARC )<br>ANTHONY CUDDY CARMONA, )<br>in his individual and official capacity, )<br>)<br>Defendants. )<br>_____ ) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on Defendants Phillip H. Redmond, Jason Patrick

Cloer, Chance Allen Williams, and Ohio Casualty Insurance Co.'s (collectively, "Iredell

Defendants'") Motion for Summary Judgment (Doc. 37) as well as Defendants City of

Statesville, David Wayne Lowery, William Howard Goforth, and Mark Anthony Cuddy

Carmona's (collectively, "Statesville Defendants'") Motion for Summary Judgment (Doc. 39),

both filed November 30, 2011.

1

# I. PROCEDURAL HISTORY

Plaintiff brought this action in the Superior Court Division of Iredell County in June 2010 asserting causes of action for negligence, gross negligence, wrongful death, trespass by public official, and deprivation of life under the North Carolina Constitution's Law of the Land Clause. Plaintiff was granted leave to amend her Complaint and added a claim under 42 U.S.C. § 1983 against the City of Statesville and Sheriff Redmond for failure to train. On November 11, 2010, Superior Court Judge Edgar Gregory granted in part Defendants' Motions to Dismiss. The remaining claims therefore consist of the section 1983 claims against the City of Statesville and Sheriff Redmond as well as claims of gross negligence, wrongful death, trespass by a public officer, and deprivation of life outside the law of the land under Article I, Sections 1 and 19 of the North Carolina Constitution against the individual defendant officers in their individual capacities.

# II. FACTUAL BACKGROUND

During the afternoon hours of Saturday, July 26, 2008, Mr. Anthony Davidson was shopping at Food Lion Store #1411 with his wife. After unsuccessfully attempting a purchase, Davidson left the store in an agitated state with an unactivated Applebee's gift card. As he did so, store management contacted the Statesville Police Department, and a patrol car was dispatched. Some seven minutes later, Officers Lowery and Goforth arrived and were referred to a nearby pizza store, where they located Davidson. After speaking with Davidson, the officers handcuffed him and advised him that he was being charged with larceny and would be transported to the Iredell County jail. Although Davidson did not physically resist the officers at this time, he made several unusual statements, claiming, for instance, to be the "son of Christ" and to have the power to remove his handcuffs by snapping his fingers three times. (Doc. 43-4 at

2

33.)

Davidson continued to make such statements even into his hearing before the Magistrate, saying, "Look into my eyes; I'll make you change your mind about letting me sign myself out." (Doc. 43-13 at 3.) The Magistrate set bond at $500.00, and Davidson was escorted to the jail's main processing area. En route, Mr. Davidson passively resisted the officers by refusing to walk or to support his own weight. (Doc. 43 at 10.) The parties dispute whether Davidson's resistence escalated. By Plaintiff's account, Defendant Williams tased Davidson without further provocation; Davidson simply turned to face Detention Officer Williams, after Williams had shouted "clear," only to be met with a taser discharge to the chest. According to the Statesville Defendants' Brief in Support of Their Motion for Summary Judgment and the affidavits of Officers Lowery and Goforth, it seems Davidson's resistence notably escalated only momentarily when Davidson lunged and yelled at Officer Lowery. Thereafter, Davidson resisted only passively before he was tased by Defendant Williams for a five-second interval.[1] Therefore, the Court will credit the passive-resistance account in addressing the summary judgment motions here at issue.

After tasing Davidson, Defendant Williams, who had a canine with him, passed his taser to Officer Lowery. Davidson then jumped up and ran down the hallway he had just traveled. Lowery triggered Williams' taser a second time, again for approximately a five-second interval (Doc. 43-18 at 1), though he testifies that the cycle was completely ineffective due to a broken

---

[1] The interval lengths mentioned throughout this Order derive from the State Bureau of Investigations' ("SBI's") Digital Evidence Analysis, which makes use of the discharge information stored on each device. (Doc. 43-18.) It is uncertain, however, whether Davidson experienced the entirety of each interval. For instance, Officer Lowery states that while this deployment was initially effective, one of the leads quickly broke, and he believes the circuit to have been incomplete for a portion of the interval. (Doc. 40-4 at 6–7.)

3

lead (Doc. 40-4 at 6–7). As Davidson continued down the hallway, Officers Lowery and Cloer began simultaneously to discharge their own tasers, Cloer for approximately two-, five-, and five-second intervals (Doc. 43-18 at 1) and Lowery for four approximately five-second intervals (Doc. 43-18 at 1–2). Lowery testifies that "dry stuns,"[2] utilized in his efforts to secure the then-floored Davidson, account for the latter three of the four discharges. (Doc. 40-4 at 7; *see* Doc. 43-18 at 2.) Finally, Officer Carmona's taser was discharged once, perhaps by Officer Williams. (Doc. 43-18 at 2; Doc. 40-6 at 5; *see* Doc. 38-13 at 59.) Ultimately, after much reported resistance, Davidson was placed in a restraint chair, donned with a "spit hood," and brought to the jail nurse.

After being informed by the jail nurse that medical clearance would be required before admitting Davidson into the Detention Center, Officers Lowery and Goforth, after some effort in securing the uncooperative Davidson within their patrol cruiser, transported Davidson to Iredell Memorial Hospital, about a 1.3-mile drive away. Officer Lowery has testified that upon arrival, Davidson was breathing but unresponsive. (Doc. 40-4 at 7–8.) Davidson died thirty hours later, after having been placed on life support. (Doc. 38-12 at 3, 5.) After performing an autopsy on Davidson, Doctor Radisch, Chief Medical Examiner for the State of North Carolina, determined

---

[2] Also known as "drive stuns," in this mode, "the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim[, which] . . . delivers an electric shock . . . but does not cause an override of the victim's central nervous system . . . ." *Mattos v. Agarano*, 661 F.3d 433, 433 (9th Cir. 2011) (en banc). Use of the drive-stun mode is a pain-compliance technique. By contrast, in probe or "dart" mode, the TASER X26, used by the officers in this case, "uses compressed nitrogen to propel a pair of 'probes'—aluminum darts tipped with stainless steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into his muscles." *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010) (internal citations omitted). This electrical impulse overrides the target's central nervous system, making muscle control impossible. *Id.*

4

the cause of death to be "complications from excited delirium." (Doc. 38-12 at 5.) This syndrome, somewhat controversial as a diagnosis, includes a varied list of potential symptoms and is associated with a history of stimulant abuse or mental illness.[3] (Doc. 43-8 at 2–3.) Risks presented by this condition are augmented by the presence of stimulant drugs or physical stress. (Doc. 43-8 at 3.)

### III. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record before the Court that the movant believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the event that this burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. Thus, the nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a motion for summary judgment, the Court must view the evidence and any reasonable inferences arising therefrom in the light most favorable to the nonmoving party.

---

[3] Davidson had detectable quantities of cocaine and marijuana in his system. (Doc. 38-12 at 3–4.)

*Anderson*, 477 U.S. at 255. Nevertheless, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (quoting *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV. ANALYSIS

A. Claim of Gross Negligence and Wrongful Death

"The issue of gross negligence should be submitted to the jury if there is substantial evidence of the defendant's wanton and/or wilful conduct." *Yancey v. Lea*, 532 S.E.2d 560, 562 (N.C. App. 2000) (citation omitted). Such conduct "lies somewhere between ordinary negligence and intentional conduct," *Siders v. Gibbs*, 249 S.E.2d 858, 860 (N.C. App. 1978), and is "of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others," *Foster v. Hyman*, 148 S.E. 36, 37–38 (N.C. 1929) (citations omitted).

"[W]hen there is substantial evidence of unusual force, it is for the jury to decide whether the officer acted as a reasonable and prudent person . . . ." *Todd v. Creech*, 209 S.E.2d 293, 295 (N.C. App. 1974). Viewing the evidence in the light most favorable to Plaintiff, a jury could find that the circumstances did not warrant the general measure of force used and therefore that the officers on the whole did not act reasonably. It is contested whether Davidson was "highly volatile" and when his resistance became more than merely passive. (Doc. 38 at 19.) Particularly in light of officer testimony; the SBI's Digital Evidence Analysis of Tasers; the outcome of Davidson's death; and Taser International's recommendation that officers conduct a "taser spark test" prior to each shift, which may undermine certain claims that attempted drive stuns were ineffective (Doc. 43-17 at 15), Plaintiff has set forth sufficient facts showing that there is a genuine issue as to the reasonableness and prudence of the officers' potentially needless means

6

of restraining Davidson as a general matter.

However, this is not true as to all officers. Plaintiff acknowledges that Defendant Goforth did not use any significant force.[4] (Doc. 43 at 26.) However, Plaintiff further argues that Defendant Goforth had obligations to transport Davidson to a hospital instead of the Detention Center and to stop Defendant Williams from using a taser. (Doc. 43 at 26–27.) Given Davidson was non-combative when taken into custody and given the medical facilities available at the Iredell County Detention Center, as discussed in section D, *infra*, Goforth, then a trainee police officer, had no obligation instead to take Davidson to a private hospital. Additionally, not knowing what Williams may have seen and having relatively little time to react, Goforth's failure to intervene is by no means indicative "of wicked purpose" or "manifesting a reckless indifference to the rights of others." *See Foster*, 148 S.E. at 37–38. Accordingly, Statesville Defendants' Motion for Summary Judgment shall be granted as to Defendant Goforth.

Finally, public officers have absolute immunity from personal liability for discretionary acts done without corruption or malice. *Schlossberg v. Goins*, 540 S.E.2d 49, 56 (N.C. App. 2000). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984) (citation omitted). It has already been established that a genuine issue of material fact has been presented as to whether

---

[4] Statesville Defendants argue that Defendant Carmona likewise used no force against Davidson. (Doc. 40 at 18.) While Carmona appears to have had a lesser role in securing Davidson, his taser was discharged once, which has significance in light of the many other contemporaneous taser discharges and the Defendants' concurrent contribution to an indivisible injury. As it is not clear from the deposition testimony who is responsible for the discharge of Carmona's taser, summary judgment shall not be granted as to Defendant Carmona. (*See* Doc. 38-13 at 59–60.)

7

Davidson was tased "needlessly," in a manner "manifesting reckless indifference as to his rights." *See id.* at 891. Given the very nature of a taser, Plaintiff has also established a genuine issue of material fact as to whether the remaining individual Defendants acted in a manner intended to be injurious. Accordingly, such immunity presents no bar to Plaintiff's claim.

B. Trespass by a Public Officer

A trespass by a public officer is a "trespass committed by a public officer under color of his office and constituting a wrongful invasion of the rights of third persons by force shown or imputed." *Fowler v. Valencourt*, 435 S.E.2d 530, 532 (N.C. 1993). Plaintiff claims trespass by a public officer by assault and battery. A police officer may be liable for assault and battery under North Carolina law when the officer has used excessive force. *Myrick v. Cooley*, 371 S.E.2d 492, 496 (N.C. App. 1988); *see Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (subsuming within the federal excessive force claim the parallel state law claim of assault and battery). To succeed on this claim, therefore, Plaintiff must prove that the defendant officers used force which was unreasonable or excessive. The reasoning in section A, *supra*, is largely applicable here, and the claim survives Defendants' summary judgment motions except as to Defendant Goforth.

C. State Constitutional Claim

The North Carolina Supreme Court has clearly held that "in the absence of an adequate state remedy," one whose state constitutional rights have been abridged has a direct claim under the North Carolina Constitution; otherwise, no direct constitutional claim is recognized. *Craig v. New Hanover County Bd. of Educ.*, 678 S.E.2d 351, 356–57 (N.C. 2009). Article I, § 19 of the North Carolina Constitution provides:

No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges,

> or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.

A claim under this section "is self-executing, and neither requires any law for its enforcement, nor is susceptible of impairment by legislation." *Amward Homes, Inc. v. Town of Cary*, 698 S.E.2d 404, 419 (N.C. App. 2010) (quoting *Sale v. Highway and Pub. Works Comm'n*, 89 S.E.2d 290, 295 (N.C. 1955)). The North Carolina Supreme Court articulated the right in *Corum v. University of N.C.*, 413 S.E.2d 276, 289, 291–92 (N.C. 1992), noting that because the common law provides a remedy for every wrong, "in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under [the North Carolina] Constitution." Thus, "[t]o assert a direct constitutional claim . . . a plaintiff must allege that no adequate state remedy exists to provide relief for the injury." *Copper v. Denlinger*, 688 S.E.2d 426, 428 (N.C. 2010). An adequate remedy is one that "provide[s] the possibility of relief under the circumstances." *Craig*, 678 S.E.2d at 355. It may be one existing at common law or one created by statute. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 n.6 (4th Cir.1995) (citing *Alt v. Parker*, 435 S.E.2d 773 (N.C. App. 1993)). Notably, the North Carolina Supreme Court cautions that in making its assessment, a court "must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power." *Corum*, 413 S.E.2d at 291.

Here, Plaintiff's claims of gross negligence and trespass by a public officer have survived summary judgment; an adequate state remedy is available. Therefore, as Plaintiff concedes, it is appropriate to grant summary judgment as to the direct constitutional claim. (Doc. 44 at 29.)

D.  Failure to Train in Violation of 42 U.S.C. § 1983

Plaintiff's final claim for relief comes against the Iredell County Sheriff, in his official capacity, and the City of Statesville for their failure to train their officers in handling arrestees exhibiting signs of mental illness and in the proper use of tasers, in violation of 42 U.S.C. § 1983. (Doc. 18 at 13–14.) More specifically, Plaintiff argues that these Defendants failed to train their employees to respond properly to an individual diagnosed with "excited delirium." Under this claim, Plaintiff seeks compensatory as well as punitive damages. (Doc. 18 at 14.)

In general, a political subdivision[5] may be held liable under section 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). As regards failure-to-train claims specifically, a political subdivision's failure to train its officers "can result in liability under section 1983 only when such failure reflects 'deliberate indifference' to the rights of its citizens." *Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). That is, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such failure under § 1983." *Harris*, 489 U.S. at 389.

Here, Plaintiff does little to address the training programs here at issue, instead choosing to discuss the conduct of the individual officers at length. In doing so, Plaintiff suggests that because such conduct occurred, it follows that there must have been a defect in training. However, presuming the individual officers' conduct to have violated Plaintiff's constitutional

---

[5] There is no argument before the Court that the Iredell County Sheriff's Office acts in this context as an "arm of the state," to which Eleventh Amendment immunity would extend. Therefore, the Court here presumes the Iredell County Sheriff to operate as an officer of the county, a political subdivision, which is devoid of such immunity.

10

rights, this alone is generally inadequate to sustain a failure-to-train claim under section 1983. A plaintiff must show a "direct causal link" between "a specific deficiency in training and the particular violation alleged." *Buffington v. Balt. County*, 913 F.2d 113, 122 (4th Cir. 1990). It will not "suffice to prove that an injury . . . could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" because "[s]uch a claim could be made about almost any encounter."[6] *Harris*, 489 U.S. at 391. Instead, a plaintiff must demonstrate specific training deficiencies and either (1) that inadequately trained employees engaged in a pattern of unconstitutional conduct or (2) that a violation of a federal right is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407–09 (1997). In the second situation, the *Harris* Court explained that the need for "more or different training" must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."[7] *Harris*, 489 U.S. at 390.

---

[6] To adopt lesser standards of fault and causation would "open municipalities to unprecedented liability under § 1983"; would "result in *de facto respondeat superior* liability . . . [,] a result rejected in *Monell*"; would "engage federal courts in an endless exercise of second-guessing municipal employee-training programs . . . [, a task that they] are ill suited to undertake"; and would "implicate serious questions of federalism." *Harris*, 489 U.S. at 391–92 (citations omitted).

[7] For example,
> city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Harris*, 489 U.S. at 390 n.10 (citation omitted).

11

The Court thus addresses whether the allegedly deficient training programs are adequate and, if inadequate, whether Plaintiff has demonstrated a pattern of unconstitutional conduct or obvious, unaddressed need for training as contemplated in *Harris*. Although there is a dearth of information in the record as to training program specifics, the Court is provided with Stateville Police Department and Iredell County Detention Center policies and procedures. Per the policy of the Statesville Police Department, a taser is considered "an electronic restraint device used to control a dangerous or violent subject when deadly force does not appear to be justified and/or needed." (Doc. 43-17 at 11.) As a "very effective device when less than lethal force options are reasonable or necessary," the taser may be used in situations involving "[m]entally ill subjects who are perceived to be violent," "[p]ersons under the influence of drugs or alcohol," and "[w]hen deemed a reasonable alternative to lesser force options." (Doc. 43-17 at 12.) "Only officers who have successfully completed the Taser Certification course may carry and/or use the Taser. Annual recertification is mandatory." (Doc. 43-17 at 11.) Department policy further specifies that, "[s]hould one or more of the following behaviors manifest, [a] suspect may require immediate medical assistance due to preexisting conditions, possible overdose, cocaine psychosis, *excited delirium* (a potentially fatal medical condition caused by a complex set of physiological conditions caused by stimulant drug abuse or non-compliance with psychiatric medications compounded by over exertion of the subject and insufficient respiration required to maintain blood chemistry), etc." (Doc. 43-17 at 12) (emphasis in original). The policy goes on to list bizarre or violent behavior, signs of overheating, slurred or slow speech, self-mutilation, and an irregular breathing pattern or loss of consciousness. (Doc. 43-17 at 12.)

As regards what follows an incident involving police use of a taser, department policy describes a "Post Taser Exposure Monitoring Period," during which specified precautionary

procedures are to be followed. (Doc. 43-17 at 14–15.) Additionally, "[a] Use of Force form should be completed for ALL Taser usage incidents . . . ." (Doc. 43-17 at 14.) The purpose of this immediate documentation is in part "to assist identifying training and equipment needs." (Doc. 43-17 at 16.)

Plaintiff has offered neither evidence of the training program's inadequacy nor evidence to suggest that Statesville Police Department norms diverge from this seemingly responsible set of policy provisions, and all Statesville officers equipped with tasers were trained in their use.[8] Accordingly, Stateville Defendants' Motion for Summary Judgment shall be granted as to this section 1983 claim.[9]

---

[8] Plaintiff does not contest that Defendant Lowery was certified in taser use (and recertified annually), that Defendant Carmona had completed ten hours in the use of the X-26 Taser by the time of the incident here at issue, and that, while Defendant Goforth had not completed any taser-related training as a rookie officer, he was not armed with a taser on the date at issue.

[9] Plaintiff further argues that the individual officers "demonstrated a reckless disregard for the safety and well being" of Davidson when they failed "immediately [to] transport him to a hospital" after noting his strange behavior. (Doc. 44 at 11–12.) The Iredell County Detention Center Admissions Policy ensures that a person receives medical treatment if needed, is screened for the need for emergency mental health treatment, and is provided with such treatment. (Doc. 46-3 at 1–7.) Such a policy indicates no "deliberate indifference" towards the needs of mentally ill arrestees. Nonetheless, although Davidson was not combative when taken into custody, and although "there is disagreement about diagnosing . . . excited delirium among mental health professionals," Plaintiff insists that Davidson should have first been taken to a private hospital. (Doc. 43 at 17; Doc. 43-7 at 15.) The Court will not deem as a violation of constitutional rights a law enforcement officer's act of transporting to a detention center's adequate medical facilities, with the possibility of further transporting to a private hospital if necessary, an arrestee apparently exhibiting only "extreme agitation," "bizarre behavior," "hallucinations," or "screaming." In any event, as Plaintiff's source of authority notes,
> By 2009, all law enforcement officers and detention deputies that had gone through the Basic Law Enforcement Training program (BLET) in North Carolina had received training on dealing with emotionally disturbed persons and the recognition of the symptoms of excited delirium syndrome. For that reason the [officers] should have been aware of the fact that excited delirium syndrome is considered a medical emergency by law enforcement and correctional officers. However, even though the [officers] witnessed Davidson exhibiting the

13

Per the policies of the Iredell County Sheriff's Office, "[d]etention officers are to use force against an inmate only if it appears reasonably necessary to prevent an escape, injury to a person or property, or to maintain or restore discipline. If physical force is required, detention officers will use the minimum amount necessary to control an inmate or maintain security." (Doc. 44-18 at 1.) The Sheriff's policies specify that physical force is not to be used to punish (Doc. 44-18 at 1) and that a taser is not to be used "[o]n a handcuffed/secured prisoner, absent overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion" (Doc. 44-17 at 4). Although "the use of more than one cycle is not prohibited[,] there must be a clearly articulable reason for the use of multiple cycles."[10] (Doc. 44-17 at 5.) Furthermore, "[o]nly officers who have satisfactorily completed an approved training course shall be authorized to use [tasers.] Officers who have satisfactorily completed an approved training course will demonstrate proficiency with the device and receive training updates

---

        symptoms of excited delirium they did not insure [sic] he was provided with immediate medical treatment.
(Doc. 44-9 at 5.) Plaintiff attacks only the conduct of the officers who had undergone BLET and proffers nothing to impugn the adequacy of their training. Therefore, such arguments are unable to save Plaintiff's failure-to-train claim.

[10] Plaintiff notes that according to Defendant Cloer's testimony, officers were not trained to avoid multiple taser applications (Doc. 44 at 18), although Cloer additionally testified that he avoids simultaneous taser deployments (Doc. 38-8 at 53). Presuming simultaneous taser deployment to be an actual violation of constitutional rights under these circumstances, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986); *see Semple v. City of Moundsville*, 195 F.3d 708, 713–14 (4th Cir. 1999). Here, there is no evidence of any policy favoring simultaneous taser deployment or pattern of such deployment, and such a specific element of taser-related training is not "so obvious," and the absence of which "so likely to result in the violation of constitutional rights," that Defendants can reasonably be said to have been deliberately indifferent to the need. *See Harris*, 489 U.S. at 390.

14

periodically." (Doc. 44-17 at 3.) Finally, once a taser has been deployed, the Sheriff's policies specify certain reporting requirements as well as "aftercare" procedures, which require that the offender receive first aid, a documented medical evaluation, and if necessary, additional medical treatment. (Doc. 44-17 at 5.)

Furthermore, in addition to other training, the individual Iredell Defendants received training in responding to inmate medical issues and subject control arrest techniques, and were certified in the use of the X26 Taser. (Docs. 38-6, 38-7.) Therefore, as Plaintiff has offered neither evidence of the training program's inadequacy nor evidence to suggest that departmental norms pertinently diverge from this set of policy provisions, which prohibit the use of a taser on a handcuffed prisoner absent overtly assaultive behavior, Iredell Defendants' Motion for Summary Judgment shall be granted as to this section 1983 claim.

E.  Plaintiff's Mention of Excessive Force in Violation of 42 U.S.C. § 1983

After the parties completed discovery and Defendants moved for summary judgment, Plaintiff, in her Responses to Defendants' Motions for Summary Judgment, explicitly raised for the first time an excessive force claim pursuant to 42 U.S.C. § 1983. However, with regard to the properly pleaded failure-to-train claims under section 1983, it was necessary for Plaintiff first to establish that constitutional violations occurred.

Plaintiff generally presented two failure-to-train theories: the first regards Defendants' failure to address adequately the needs of an arrestee exhibiting signs of excited delirium, and the second regards Defendants' excessive use of tasers. Under the second theory, if the force used by the officers were reasonable, no claim could be made for failure to train, because any such failure would not have resulted in a constitutional violation. Because there is an underlying claim of excessive force necessary to sustain Plaintiff's failure-to-train claim, once the failure-

15

to-train claim was pleaded, Defendants necessarily received fair notice of the excessive force claim and the grounds for such claim.

Furthermore, because Plaintiff has produced evidence sufficient to establish a genuine issue of material fact as to Davidson's passive level of resistence and the individual officers' objectively unreasonable taser use, as addressed within the Court's discussion of Plaintiff's state-law claims, Plaintiff's excessive-force claim is not amenable to summary judgment. *See Graham v. Connor*, 490 U.S. 386, 388 (1989) (noting that excessive-force claims should be analyzed under the Fourth Amendment and its reasonableness standard).

## V. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendants' Motions for Summary Judgment (Docs. 37, 39) be **GRANTED** in part and **DENIED** in part. Summary judgment is granted as to all claims against Defendant Goforth; as to the deprivation-of-life claim under the North Carolina Constitution's Law of the Land Clause; and as to the failure-to-train claims pursuant to section 1983 against the Iredell County Sheriff and the City of Statesville.

Signed: April 26, 2012

Richard L. Voorhees
United States District Judge